1    **REICH RADCLIFFE & HOOVER LLP**
     Marc G. Reich (SBN 159936)
2    mgr@reichradcliffe.com
     Adam T. Hoover (SBN 243226)
3    adhoover@reichradcliffe.com
     2030 Main Street, Suite 1300
4    Irvine, CA 92614
     Phone: (949) 975-0512
5    Fax: (949) 208-2839

6    **LIFSHITZ LAW PLLC**
     Joshua M. Lifshitz (*Pro Hac Vice to be submitted*)
7    jlifshitz@lifshitzlaw.com
     1190 Broadway
8    Hewlett, NY 11557
     Phone: (516) 493-9780
9    Fax: (516) 280-7376

10   Attorneys for Plaintiff

11                    UNITED STATES DISTRICT COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13

14   ALEXANDRE ROBERTS, Derivatively on Behalf    Case No: 3:23-cv-2248
     of Nominal Defendant VIEW, INC.,

15              Plaintiff,

16   v.                                           **VERIFIED SHAREHOLDER DERIVATIVE**
                                                  **COMPLAINT**
17   RAO MULPURI, VIDUL PRAKASH, TOBY
     COSGROVE, LISA PICARD, and NIGEL             **Demand for Jury Trial**
18   GORMLY,

19              Defendants,
     and,
20
     VIEW, INC.,
21
                Nominal Defendant.
22

23

24

25

26

27

28

By and through his undersigned counsel, Plaintiff Alexandre Roberts ("Plaintiff") shareholder derivative action on behalf of Nominal Defendant View, Inc. ("View" or the "Company") and against certain current and former officers and directors of the Company for: (i) violations of §10(b) and/or 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder; (ii) breaches of fiduciary duties; (iii) unjust enrichment; and (iv) waste of corporate assets. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by View and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on View's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related consolidated securities fraud class action lawsuit captioned *Mehedi Et Al V. View, Inc. F/K/A Cf Finance Acquisition Corp. II, et al.*, Case No. 5:21-cv-06374-BLF (the "Related Securities Action"); and (e) review of other publicly-available information concerning View and the Defendants.

## NATURE OF THE ACTION

1.     Plaintiff brings this action derivatively for the benefit of Nominal Defendant View against certain of the Company's current executive officers and directors aiming to rectify the Defendants' violations of the Exchange Act and breaches of fiduciary duties for issuing false and misleading statements and/or omitting material information in the Company's public filings and proxy statements from approximately November 30, 2020, through May 10, 2022 (the "Relevant Period").[1]

2.     View is a technology company that manufactures smart building products that are purportedly designed to improve people's health, productivity, and experience while reducing energy consumption in buildings or structures. During the Relevant Period, View's primary product was a

---

[1] The materially misleading statements and/or omissions were issued in the Company's financial reports and other public filings and releases from approximately November 30, 2020, through May 10, 2022; however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

proprietary electrochromic or "smart" glass panel that adjusted in response to the sun by tinting from clear to dark states, thereby reducing heat and glare.

3.     CF II was a special purpose acquisition company ("SPAC") formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more businesses.

4.     On March 8, 2021, pursuant to an Agreement and Plan of Merger dated November 30, 2020 ("Merger Agreement"), and the other transactions described in the Merger Agreement, CF II and View combined via a business combination with CF II (now referred to as View) as the surviving, public entity (the "Business Combination").

5.     Throughout the Relevant Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants have now admitted that View's financial statements for fiscal years ending 2019-2020 and certain quarterly periods as detailed herein that are set forth in SEC filings alleged herein, were materially false when issued and, were required to be restated. These financial statements were misrepresentations of then-existing material facts, that also failed to disclose to investors that (1) View's warranty-related obligations, and the cost of revenue associated with the recognition of those liabilities, were materially false and misleading because Defendants excluded expenses View incurred and expected to incur due to significant quality issues; (2) View falsely recorded the liabilities for warranty-related obligations and cost of revenue; (3) View inappropriately excluded from these liabilities certain costs it incurred and intended to incur when replacing the Company's insulated glass units ("IGUs"), including installation labor and freight costs; (4) as a result, the previously reported liabilities associated with warranty-related obligations and the cost of revenue associated with the recognition of those liabilities were false and materially misstated; and (5) that as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were false and materially misleading.

6.     On August 16, 2021, after the market closed, View announced that its Audit Committee "began an independent investigation concerning the adequacy of the company's previously disclosed warranty accrual."

7.    On this news, the Company's share price fell $1.26, or over 24%, to close at $3.92 per share on August 17, 2021, on unusually heavy trading volume.

8.    On January 4, 2022, View announced that the Company expected to issue its restated financials "in the first quarter of 2022." Then, on March 28, 2022, View announced a delay in the timing of its expected financial restatement, and it indicated that the Company expected to complete its financial restatement "in May 2022."

9.    On March 7, 2022, View reassured investors that the Company had turned the corner, announcing "its cash balance of $281 million as of December 31, 2021 with no substantial debt on the balance sheet. View expects to improve cash burn through 2022 on higher volumes and revenues combined with associated improvements in operational efficiencies."

10.   Then, only 8 weeks later, on May 10, 2022, after the market closed, View revealed that in addition to being unable to file its Quarterly Report on Form 10-Q for the period ended March 31, 2022 within the prescribed time period, "management anticipates that they will be disclosing substantial doubt about the Company's ability to continue as a going concern, as the Company does not currently have adequate financial resources to fund its forecasted operating costs and meet its obligations for at least twelve months from the expected issuance date of the 2021 Annual Report on Form 10-K."

11.   Later that same day, at approximately 11:13 p.m. Pacific Time, View announced that ". . . its cash position [is] $201 million as of the end of Q1 2022 with no substantial debt on its balance sheet. When the Company issues its 2021 financial statements, it anticipates that its reported cash outflow from operations for the twelve months ended December 31, 2021, ranged from $260 million to $270 million."

12.   On this news, the Company's share price fell $0.844, or over 62%, to close at $0.516 per share on May 11, 2022, on unusually heavy trading volume.

13.   Finally, on May 31, 2022, View reported that its yet-to-be restated warranty-related accruals would be $53 million, $48 million, and $42 million as of December 31, 2019, 2020, and 2021 respectively, revealing that these key metrics were falsely understated in View's financial statements filed with the SEC by more than 100%.

14.     On June 15, 2022, View filed its annual report on Form 10-K for the year ended December 31, 2021 (the "2021 10-K"), an amendment to its quarterly report on Form 10-Q/A for the period ended March 31, 2021 (the "1Q21 10-Q/A"), and quarterly reports on Form 10-Q for the periods ended June 30 (the "2Q21 10-Q") and September 30, 2021 (the "3Q21 10-Q"), marking the completion of the financial restatement. In its 2021 10-K, View announced that in January 2022 the Company was informed that the SEC was conducting a formal investigation of its previously reported warranty accrual.

15.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, the Company and its investors have suffered significant damages.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to the subject matter of this action pursuant to 28 U.S.C. § 1331 because the claims arise under and pursuant to §10(b) of the Exchange Act and Rule 10(b)-5 promulgated thereunder.

17.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a), as they relate to Plaintiff's claims under 15 U.S.C. §78n(a).

18.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), because a substantial portion of the transactions and wrongs complained of herein occurred in this District and defendants have received substantial compensation within this District by doing business here and engaging in numerous activities that had an effect in this jurisdiction.

## THE PARTIES

19.     Plaintiff has been a shareholder during the Relevant Period, is currently, and at all relevant times has been, a holder of View common stock.

20.     Nominal Defendant View is incorporated in Delaware and its current principal executive offices are located at 195 S. Milpitas Blvd., Milpitas, California 95035. View is the leader in smart building technologies that transform buildings to improve human health and experience, reduce energy consumption and carbon emissions, and generate additional revenue for building owners. Shares of View's common stock are traded on the NASDAQ under the symbol "VIEW."

21.     Defendant Rao Mulpuri ("Mulpuri") has been a member of the Board since 2008. In addition, Defendant Mulpuri has been the Company's Chief Executive Officer ("CEO") since December 2008. For the fiscal years of 2021, 2020, and 2019, Defendant Mulpuri received $134,836,503, $325,837, and $508,400 in total compensation, respectively.

22.     Defendant Vidul Prakash ("Prakash") served as the Company's Chief Financial Officer ("CFO") at all relevant times until his resignation on November 8, 2021. For the fiscal years of 2021, 2020, and 2019, Defendant Prakash received $10,878,923, $358,500, and $5,324,827 in total compensation, respectively.

23.     Defendant Mulpuri and Prakash are collectively referred to herein as the "Officer Defendants."

24.     Defendant Toby Cosgrove ("Cosgrove") has been a member of the Board since 2021. In addition, Defendant Cosgrove was appointed as Chairman on February 23, 2022. Defendant Cosgrove is a member of the Compensation Committee and the Nominating and Corporate Governance Committee.

25.     Defendant Lisa Picard ("Picard") has been a member of the Board since 2021. In addition, Defendant Picard is the Chair of the Compensation Committee and is a member of the Audit Committee.

26.     Defendant Nigel Gormly ("Gormly") has been a member of the Board since 2015. In addition, Defendant Gormly is the Chair of the Audit Committee and a member of the Nominating and Corporate Governance Committee.

27.     Defendants Mulpri, Cosgrove, Picard, and Gormly are referred to hereinafter collectively as the "Director Defendants."

28.     The Officer Defendants, along with the Director Defendants are referred to herein collectively as the "Individual Defendants."

29.     Defendant View, along with the Individual Defendants are referred to herein collectively as the "Defendants."

30.    Related Party Non-Defendant Julie Larson-Green ("Larson-Green") has been a director of View since June 2021. Larson-Green is Chair of the Nominating and Corporate Governance Committee and a member of the Audit Committee.

31.    Related Party Non-Defendant Scott Rechler ("Rechler") has been a director of View since November 2022.

## FIDUCIARY DUTIES ON THE INDIVIDUAL DEFENDANTS

32.    By reason of their positions as officers, directors, and/or fiduciaries of View, and because of their ability to control the business and corporate affairs of View, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage View in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of View and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

33.    Each director and officer of the Company owes to View and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

34.    In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

### Duties of the Members of the Audit Committee

35.    Pursuant to the Audit Committee Charter of View (amended as of March 8, 2021),[2] the purpose of the Audit Committee is to assist the Board in overseeing and monitoring: (i) the Company's accounting and financial reporting processes; (ii) the quality and integrity of the Company's financial statements and the auditing of those financial statements; (iii) compliance with

---

[2] Available at https://investors.view.com/static-files/abee8883-ab7b-4bcd-8db1-da434fa13ae9.

legal and regulatory requirements; (iv) the Company's independent registered public accounting firm's

qualifications and independence; (v) the design and implementation of the Company's internal audit

function, if applicable; and (vi) the appointment, compensation, retention, oversight and performance

of the Company's independent registered public accounting firm. The Committee shall also perform

such further functions as may be consistent with this Charter or assigned by applicable law, the

Company's certificate of incorporation or bylaws or the Board.

36.     The responsibilities of the Audit Committee include the following, among others:

**A.     Selection, Evaluation and Oversight of the Independent Auditors**

The Committee shall have the following duties and responsibilities with respect to the engagement of independent registered public accounting firms:

(a) Be directly responsible for the appointment, compensation, retention and oversight of the work of any registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company, and each such registered public accounting firm must report directly to the Committee.

(b) Review and approve the Independent Auditor's annual engagement letter, including the proposed fees contained therein, as well as all audit and permitted non-audit engagements and relationships between the Company and the Independent Auditor (which approval should be made after receiving input from the Company's management, if desired). Approval of audit and permitted non-audit services will be made by the Committee. The Committee also may delegate pre-approval authority to one or more of its members, who shall report any pre-approval decisions to the Committee at its next regularly scheduled meeting.

(c) Review the performance of the Independent Auditor, including the lead partner of the Independent Auditor, and, in its sole discretion (subject, if applicable, to shareholder ratification), make decisions regarding the replacement or termination of the Independent Auditor when circumstances warrant.

(d) At least annually, obtain and review a report from the Independent Auditor describing (i) the Independent Auditor's internal quality-control procedures and (ii) any material issues raised by the most recent internal quality-control review, or peer review, of the Independent Auditor, or by any inquiry or investigation by governmental or professional authorities within the preceding five years, respecting one or more independent audits carried out by the Independent Auditor, and any steps taken to deal with any such issues.

(e) Evaluate the Independent Auditor's independence by, among other things:

(i) obtaining from the Independent Auditor and reviewing written statements and communications relating to relationships between the Independent Auditor and the Company required by applicable auditing standards of the Public Company Accounting Oversight Board (the "PCAOB") and SEC rules;

(ii) engaging in a dialogue with the Independent Auditor with respect to any disclosed relationships or services that may impact its objectivity and independence;

(iii) taking, or recommending that the Board take, appropriate actions to oversee the independence of the Independent Auditor;

(iv) monitoring the Independent Auditor's compliance with the audit partner rotation requirements contained in applicable SEC rules;

(v) monitoring compliance by the Company of the employee conflict of interest requirements contained in applicable SEC rules; and

(vi) engaging in a dialogue with the Independent Auditor to confirm that audit partner compensation is consistent with applicable SEC rules.

**B.      Oversight of Annual Audit and Quarterly Reviews**

The Committee shall have the following duties and responsibilities with respect to the Company's annual audit and quarterly reviews:

(a) Review and discuss with the Independent Auditor its annual audit plan, including the timing and scope of audit activities, and monitor such plan's progress and results during the year.

(b) Review with management, the Independent Auditor and the head of the Company's internal audit function, if applicable, the following:

(i) all critical accounting policies and practices to be used;

(ii) any critical audit matters arising from the current period audit;

(iii) all alternative treatments of financial information that the Independent Auditor has discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the Independent Auditor;

(iv) all other material written communications between the Independent Auditor and management, such as any management letter and any schedule of unadjusted differences; and

(v) any material financial arrangements of the Company which do not appear on the financial statements of the Company.

(c) Resolve all disagreements between the Independent Auditor and management regarding financial reporting.

**C.  Oversight of the Financial Reporting Process and Internal Controls**

The Committee shall have the following duties and responsibilities with respect to the Company's financial reporting process and internal controls:

(a) Review:

(i) the adequacy and effectiveness of the Company's accounting and internal control policies and procedures on a regular basis, including the responsibilities, budget, compensation and staffing of the Company's internal audit function, if applicable, through inquiry and discussions with the Independent Auditor, management and the head of the Company's internal audit function; and

(ii) the yearly report prepared by management, and attested to by the Independent Auditor, assessing the effectiveness of the Company's internal control over financial reporting and stating management's responsibility for establishing and maintaining adequate internal control over financial reporting prior to its inclusion in the Company's Annual Report on Form 10-K.

(b) Review periodically with the Chief Executive Officer, Chief Financial Officer and the Independent Auditor:

(i) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

(ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

(c) Discuss guidelines and policies governing the process by which senior management of the Company and the relevant departments of the Company, including the internal audit function, assess and manage the Company's exposure to risk, as well as the Company's major litigation and financial risk exposures and the steps management has taken to monitor and control such exposures.

(d) Review and discuss with the Independent Auditor the results of the year-end audit of the Company, including any comments or recommendations of the Independent Auditor, and, based on such review and discussions and on such other considerations as it determines appropriate, recommend to the Board whether the Company's financial statements should be included in the Annual Report on Form 10-K.

(e) Review the type and presentation of information to be included in the Company's earnings press releases (especially the use of "pro forma" or "adjusted" information not prepared in compliance with generally accepted accounting principles), as well as financial information and earnings guidance provided by the Company to analysts and rating agencies (which review may be done generally (e.g., discussion of the types of information to be disclosed and type of presentations to be made), and the Committee need not discuss in advance each earnings release or each instance in which the Company may provide earnings guidance).

**D. Miscellaneous**

The Committee shall have the following additional duties and responsibilities:

(a) Oversee the policies and procedures in the Company's Related Party Transactions Policy and review proposed transactions or courses of dealings requiring approval or ratification under such policy.

(b) Meet periodically with the General Counsel, and outside counsel when appropriate, to review legal and regulatory matters, including any matters that may have a material impact on the financial statements of the Company.

(c) Prepare the audit committee report required by Item 407(d) of Regulation S-K to be included in the Company's annual proxy statement.

(d) Review the Company's program to monitor compliance with the Company's Code of Business Conduct and Ethics, and meet periodically with the Company's General Counsel to discuss compliance with said Code of Business Conduct and Ethics.

(e) Provide for appropriate funding by the Company, as determined by the Committee, in its capacity as a committee of the Board, for payment of:

(i) compensation to any registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services;

(ii) compensation to any advisers employed by the Committee; and

(iii) ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.

(f) Establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

(g) Perform such additional activities, and consider such other matters, within the scope of its responsibilities, as the Committee or the Board deems necessary or appropriate.

37. Upon information and belief, the Company maintained versions of the Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

38. Upon information and belief, the Company maintained versions of the Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the members of the Company's Audit Committee.

<b>Duties Pursuant to the Company's Code of Business Conduct and Ethics</b>

39. The Individual Defendants, as officers and/or directors of View, were also bound by the Company's Code of Business Conduct and Ethics (the "Code")[3] which, according to the Code, sets out guiding principles to all directors, officers, and employees of View, who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.

40. Regarding basic general principles of conduct, the Code states that:

View always strives to conduct business with integrity and in compliance with all laws and regulations where we operate. This applies to every business decision in every area of the company.

We achieve this through our guiding principles:

**We Think Before We Act**
Demonstrating trust in day-to-day work.

**We Treat Everyone with Respect**
Creating and maintaining a respectful and inclusive workplace.

**We Protect View Information and Assets**
Upholding responsible data handling practices and transparency.

**We Do Business with Integrity**
Doing the right thing, no matter who is watching and even when it's hard.

41. Regarding disclosures and retention of the Company's business and financial records, the Code states:

---

[3] Available at https://investors.view.com/static-files/51fd1f5a-9ffc-402a-bedb-cf35308c0af3.

**Accurate Recordkeeping**

Each of us is responsible for keeping complete, clear, and accurate records related to our work at View. We cannot make good decisions with bad data. You should obviously never falsify any record or report. Speak up to your manager or through the Integrity Line if you see information that is inaccurate or incomplete. Ensure that corrections are made. No one should ever put pressure on others to shade the truth. Our records, and how we maintain them, are a sign of View's health to the outside world. As a public company, View has a legal obligation to report accurate financial results. Immediately report any concerns regarding the accuracy of financial records or failures of our internal controls to Compliance, Internal Audit, or through the Integrity Line. You should follow View's Records Retention Policy to ensure that records are kept in the right way and for the right amount of time. Finally, as a View employee, you must fully cooperate with any audits or investigations over your area of responsibility.

42.   Upon information and belief, the Company maintained versions of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar duties on, among others, the Individual Defendants, as those set forth above.

## Control, Access, and Authority

43.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of View, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by View.

44.   Because of their advisory, executive, managerial, and directorial positions with View, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of View.

45.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of View and was at all times acting within the course and scope of such agency.

## Reasonable and Prudent Supervision

46.   To discharge their duties, the officers and directors of View were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of View were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d) remain informed as to how View conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that View was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**BREACHES OF DUTIES**

47.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to View and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of View, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of View, the absence of good faith on their part, and a reckless disregard for their duties to View and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to View.

48.    The Individual Defendants each breached their duties of loyalty and good faith by allowing the Individual Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

49.    In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Related Securities Action that alleges violations of the federal securities laws. As a result, View has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

50.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

51.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

52.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties, unjust enrichment, and waste of corporate assets; and (b) disguise and misrepresent the Company's actual business and financial prospects.

53.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

54.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

55.     View is a technology company that manufactures smart building products that are purportedly designed to improve people's health, productivity, and experience while reducing energy consumption. Its primary product is a proprietary electrochromic or "smart" glass panel that, in combination with the Company's proprietary network and software, intelligently adjusts in response to the sun by tinting from clear to dark states, thereby reducing heat and glare.

### Background of CF II

56.     CF II was a special purpose acquisition company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more businesses. Prior to the completion of its merger with View, CF II's Class A Common Stock, Units, and Warrants were listed on Nasdaq under the symbols "CFII", "CFIIU" and "CFIIW", respectively.

### View's Business Combination With CF II

57.     On September 1, 2020, CF II, a New York City-based special purpose acquisition company, announced that it consummated its initial public offering of 50 million units at $10 per share, resulting in gross proceeds of $500 million. The units traded on Nasdaq under the ticker symbol "CFIIU". Each unit consisted of one share of CF II's Class A common stock and one-third of one warrant, with each whole warrant enabling the holder thereof to purchase one share of Class A common stock at a price of $11.50 per share. When the shares of Class A common stock and warrants began separate trading, they traded on Nasdaq under the symbols "CFII" and "CFIIW."

58.     Known as a "blank check" company, CF II was formed by Defendants Lutnick, Jain, and Pion for the purpose of entering into a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more businesses in the diversified resources and industrial materials sectors.

59.     On November 30, 2020, CF II announced a definitive agreement for a business combination with Defendant View that would result in View becoming a publicly listed company. To affect the Business Combination, CF II, PVMS Merger Sub, Inc., a Delaware corporation and a

wholly-owned subsidiary of CF II, merged with and into View, with View surviving the merger. The transaction was expected to deliver up to $800 million of gross proceeds including the contribution of up to $500 million of cash held in CF II's trust account from its initial public offering. The transaction was further supported by a $300 million private investment in public equity ("PIPE") at $10.00 per share.

60.     Specifically, at the same time as the execution of the Merger Agreement, CF II entered into separate Subscription Agreements with a number of subscribers (each a "Subscriber"), including CF II's sponsor, CF Finance Holdings II, LLC (the "Sponsor"), pursuant to which the Subscribers agreed to purchase, and CF II agreed to sell to the Subscribers, an aggregate of up to 30,000,000 shares of Class A Common Stock (the "PIPE Shares"), for a purchase price of $10.00 per share and an aggregate purchase price of $300 million (the "PIPE Investments"), with the Sponsor's Subscription Agreement accounting for $50 million of such aggregate PIPE Investments.

61.     Goldman Sachs & Co. LLC acted as exclusive financial advisor to View in connection with the transaction. CF&Co. acted as financial and capital markets advisor to CF II in connection with the transaction. CF&Co. and Goldman Sachs & Co. LLC served as placement agents for the PIPE financing.

62.     On December 23, 2020, CF II filed a registration statement for View on Form S-4 with the SEC (the "De-SPAC Registration Statement"), which De-SPAC Registration Statement was, pursuant to Section 7.2(a) of the Merger Agreement, to be "prepare[d]" by CF II and View. The De-SPAC Registration Statement was amended on January 26, 2021 and February 11, 2021 on Form S-4/A. The CF II Individual Defendants signed the De-SPAC Registration Statement.

63.     The De-SPAC Registration Statement stated that the CF II Board (including, at that time, the CF II Individual Defendants: Lutnick, Pion, Chan, Jain, Hochberg, and Blechman) unanimously recommends that CF II stockholders vote in favor of the Business Combination. The De-SPAC Registration Statement also stated that the View Board (including, at that time, Defendants Mulpuri and Gormly) unanimously approved the entry into the Merger Agreement and the Transactions and certain other matters.

64.     On January 11, 2021, Defendants issued a joint press release announcing an additional PIPE investment of $200 million, increasing the fully committed PIPE investment from $300 million to $500 million. With the additional $200 million PIPE investment, the transaction was expected to deliver up to $1 billion of gross proceeds.

65.     On February 16, 2021, Defendants caused CF II to file a proxy statement/consent solicitation statement/prospectus with the SEC on Form 424(b)(3) (the "Proxy Statement/Prospectus"), which was incorporated into and formed part of the De-SPAC Registration Statement. On February 17, 2021, the SEC declared the De-SPAC Registration Statement effective.

66.     The Proxy Statement/Prospectus invited CF II investors to solicit proxies to vote to approve the Business Combination at a special meeting to be held on March 5, 2021. The record date for the special meeting was January 27, 2021.

67.     Upon closing of the transaction, the combined entity would be named "View, Inc." and would remain listed on the Nasdaq and trade under the new ticker symbol "VIEW." Under the proposed transaction, at closing, View would receive approximately $815.2 million in cash (reportedly $518.3 million after retiring existing debt), which was a combination of CF II cash and cash from the PIPE (private investment in public entity) investment.

68.     The Business Combination was approved by CF II stockholders in a special meeting held on March 5, 2021, and the Business Combination was consummated on March 8, 2021.

69.     On March 8, 2021, View announced that it completed the Business Combination with CF II. Beginning on March 9, 2021, View's common stock and warrants began trading on the Nasdaq under the new ticker symbols "VIEW" and "VIEWW."

**Defendants' Materially False and Misleading Statements and Omissions**

70.     On November 30, 2020, the CF II Defendants caused CF II to file with the SEC a Current Report on Form 8-K, with an exhibit consisting of a joint press release, announcing that they had entered into a definitive merger agreement stating, in relevant part:

View, Inc. ("View"), a Silicon Valley-based smart window company, and CF Finance Acquisition Corp. II (Nasdaq: CFII) ("CF II"), a special purpose acquisition company sponsored by Cantor Fitzgerald, today announced they have entered into a definitive

merger agreement. The combined company will be called View, Inc. and will be publicly listed on the NASDAQ market following the close of the transaction.

\*       \*       \*

**Transaction Details**

The Board of Directors of each of View and CF Finance Acquisition Corp. II have unanimously approved the transaction. The transaction will require the approval of the stockholders of CF Finance Acquisition Corp. II and View, and is subject to other customary closing conditions, including the receipt of certain regulatory approvals. The transaction is expected to close in the first quarter of 2021.

Assuming no redemptions by CF II stockholders, the transaction is expected to deliver up to $800 million of gross proceeds including the contribution of up to $500 million of cash held in CFII's trust account from its initial public offering. The transaction is further supported by a $300 million private investment in public equity ("PIPE") at $10.00 per share.

All cash remaining in CF II at the closing after paying off transaction expenses and CF II liabilities is expected to be used to retire debt and to add cash to View's balance sheet for working capital, growth capex and other general corporate purposes.

71.    Attached to the November 30, 2020 8-K was an investor presentation (the "Investor Presentation") that would be used by CF II and View with respect to the Business Combination. The Investor Presentation included a summary of View's Consolidated Balance Sheet, Consolidated Statements of Comprehensive Loss, and Consolidated Statement of Cash Flows for 2018, 2019, and 2020 for the nine months ended September 30. The Consolidated Statements of Comprehensive Loss stated that View reported ***cost of sales of $142.646 million in 2018, $179.674 million in 2019, and $91.925 million in 2020 for the nine months ended September 30.*** The Consolidated Statement of Cash Flows stated that View reported ***"Loss contingencies" of $24.471 million in 2019.***

72.    The above statements were materially false and/or misleading, and failed to disclose material adverse facts about the Company at the time they were made because the Defendants materially misstated certain of View's warranty-related obligations, and the cost of revenue associated with the recognition of those liabilities in 2019 and 2020. Defendants have admitted that, in contrast to View's reported cost of revenues and warranty accrual outlined above, View's restated warranty-related accruals are $53 million and $48 million as of December 31, 2019 and 2020 respectively, and View's restated cost of revenue was $203.732 million as of December 31, 2019. Additionally, View's

cost of revenue was understated by $7.1 million for periods prior to 2019. Furthermore, Defendants failed to disclose to investors that (1) View's warranty-related obligations, and the cost of revenue associated with the recognition of those liabilities, were materially false and misleading because they excluded expenses View incurred and expected to incur due to significant quality issues; (2) View falsely recorded the liabilities for warranty-related obligations and cost of revenue; (3) View inappropriately excluded from these liabilities certain costs it incurred and intended to incur when replacing the Company's IGUs, including installation labor and freight costs; (4) as a result, the previously reported liabilities associated with warranty-related obligations and the cost of revenue associated with the recognition of those liabilities were false and materially misstated; and (5) that as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were false and materially misleading.

73. The merger agreement provided that CF II and View "shall prepare" the "registration statement on Form S-4 (as amended or supplemented from time to time, and including the Proxy Statement…." On December 23, 2020, CF II filed its De-SPAC Registration Statement on Form S-4 in connection with the Business Combination.

74. The De-SPAC Registration Statement reported that View recorded a one-time warranty accrual of $24.5 million during the nine months ended September 30, 2019 and that the Company's cost of revenue decreased year-over-year during the nine months ended September 30, 2020. Specifically, the De-SPAC Registration Statement stated (emphasis added):

> ***Cost of revenue decreased by $44.2 million or 32.5%, from $136.0 million in the nine months ended September 30, 2019, to $91.8 million in the nine months ended September 30, 2020. The decrease in the cost of revenue was primarily related to three factors: (a) a one-time warranty accrual of $24.5 million during the nine months ended September 30, 2019 related to faulty materials from one of our suppliers used in the manufacturing of IGUs . . .***

75. The De-SPAC Registration Statement also reported that View's cost of revenue increased year-over-year in fiscal year 2019. Specifically, the Registration Statement stated (emphasis added):

> ***Cost of revenue increased by $37.0 million, or 26.0%, from $142.6 million in fiscal***

*year 2018 to $179.7 million in fiscal year 2019. The increase in the cost of revenue was primarily due to three factors: (a) a warranty accrual of $24.5 million in fiscal year 2019 related to faulty materials from one of our suppliers used in the manufacturing of IGUs . . .*

76.    The Notes to View's 2018 and 2019 Consolidated Financial Statements, contained within the De-SPAC Registration Statement, reported that View recorded a Warranty accrual for the year ended December 31, 2019 of $23.43 million.

77.    The above statements were materially false and/or misleading, and failed to disclose material adverse facts about the Company at the time they were made because, the Defendants materially misstated certain of View's warranty-related obligations, and the cost of revenue associated with the recognition of those liabilities in 2019 and 2020 for the nine months ended September 30. Defendants have admitted that, in contrast to View's reported cost of revenues and warranty accrual outlined above, View's restated warranty-related accruals are $53 million and $48 million as of December 31, 2019 and 2020 respectively, and View's restated cost of revenue was $203.732 million as of December 31, 2019. Furthermore, Defendants failed to disclose to investors that (1) View's warranty-related obligations, and the cost of revenue associated with the recognition of those liabilities, were materially false and misleading because they excluded expenses View incurred and expected to incur due to significant quality issues; (2) View falsely recorded the liabilities for warranty-related obligations and cost of revenue; (3) View inappropriately excluded from these liabilities certain costs it incurred and intended to incur when replacing the Company's IGUs, including installation labor and freight costs; (4) as a result, the previously reported liabilities associated with warranty-related obligations and the cost of revenue associated with the recognition of those liabilities were false and materially misstated; and (5) that as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were false and materially misleading.

78.    On January 26, 2021, CF II filed an amendment to the De-SPAC Registration Statement on Form S-4/A (the "January 26, 2021 Amendment"), which contained the same financials alleged to be false in the De-SPAC Registration Statement.

79.    The statements above were materially false and misleading, and failed to disclose material adverse facts about the Company at the time they were made.

80.    Additionally, the January 26, 2021 Amendment further clarified that, regarding its warranty accrual, "[the] estimated cost to calculate the cost to replace the IGUs . . . includes our expectations regarding future reductions in production costs which are primarily comprised of materials, labor, and factory overhead." (emphasis added).

81.    The statement above was materially false and misleading, and failed to disclose material adverse facts about the Company at the time they were made. Additionally, the statement above failed to disclose to investors that View inappropriately excluded from such "estimated cost" certain costs, including labor and freight costs, it intended to incur when replacing the IGUs.

82.    On February 11, 2021, CF II filed an amendment to the De-SPAC Registration Statement on Form S-4/A (the "February 11, 2021 Amendment").

83.    The statements above were materially false and misleading, and failed to disclose material adverse facts about the Company at the time they were made.

84.    On February 16, 2021, the CF II Defendants filed the Proxy Statement/Prospectus on Form 424(b)(3) soliciting stockholders who held as of the January 27, 2021 record date to vote to approve the Business Combination at a special meeting to be held on March 5, 2021. The Proxy Statement/Prospectus, which was incorporated into and formed part of the De-SPAC Registration Statement, solicited stockholder approval for the Business Combination. The same day, the De-SPAC Registration Statement was declared effective.

85.    The Merger Agreement, Annex A to both the De-SPAC Registration Statement and to the Proxy, provided that CF II and View (i.e. Legacy View) "shall prepare" the "registration statement on Form S-4 (as amended or supplemented from time to time, and including the Proxy Statement the 'Registration Statement', with the Proxy Statement contained therein…."

86.    The Proxy Statement/Prospectus also included the December 23, 2020 audit report of PwC, which stated in pertinent part:

> Report of Independent Registered Public Accounting Firm
> To the Board of Directors and Stockholders of View, Inc.

Opinion on the Financial Statements

We have audited the accompanying consolidated balance sheets of View, Inc. and its subsidiary (the "Company") as of December 31, 2019 and 2018, and the related consolidated statements of comprehensive loss, of redeemable convertible preferred stock and stockholders' deficit and of cash flows for the years then ended, including the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2019 and 2018, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

*       *       *

Basis for Opinion

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits of these consolidated financial statements in accordance with the standards of the PCAOB and in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ PricewaterhouseCoopers LLP
San Jose, California
December 23, 2020
We have served as the Company's auditor since 2013.

87.    On March 8, 2021, View announced that it completed the Business Combination with CF

II.

88.     On March 12, 2021, the Company filed a March 8, 2021 Current Report on Form 8- K (the "March 12, 2021 8-K"), signed by Defendant Prakash. The March 12, 2021 8-K at Ex. 99.1 also included View's consolidated financial statements for the fiscal years ended 2019 and 2020, as well as PwC's audit opinion thereon. The March 12, 2021 8-K reported that the Company's cost of revenue decreased year-over-year in the year ended December 31, 2020. Specifically, the March 12, 2021 8-K stated (emphasis added):

> **Cost of revenue decreased by $56.6 million or 31.5%, from $179.7 million in the year ended December 31, 2019 to $123.1 million in the year ended December 31, 2020. The decrease in the cost of revenue was primarily related to the three following factors:**
>
> **(a) A decrease of $25.5 million related to a one-time warranty accrual for faulty materials from one of our suppliers used in the manufacturing of IGUs. In 2019, we identified a quality issue with certain material purchased from one of our suppliers utilized in the manufacturing of certain IGUs.** We stopped using the affected materials upon identification in 2019. As of December 31, 2020, we had a low warranty claim rate related to this matter. We have replaced and expect to continue to replace affected IGUs for the remainder of the period covered by the warranty. We analyzed the risk of failure of the affected IGUs by analyzing failure rate as a function of time required for the IGU to fail since it was installed, and the geographical region where the IGU was ultimately installed. Based on this analysis, **we estimated the number of IGUs expected to fail in the remaining warranty period and applied an estimated cost to calculate the cost to replace the IGUs. The estimated cost includes our expectations regarding future reductions in production costs which are primarily comprised of materials, labor, and factory overhead. Based on our analysis, we recognized $24.5 million of expense for the estimated future cost to replace defective IGUs classified in cost of revenue in our consolidated statement of comprehensive loss for the year ended December 31, 2019. . . .**

89.     Regarding View's cash flows from operating activities for the year ended December 31, 2019, the March 12, 2021 8-K reported a **net loss of $289.904 million** for FYE 2019 and further stated that certain non-cash charges from operating activities were offset by "net cash inflows from changes in operating assets and liabilities [that] were **primarily due to a $26.1 million increase in accrued compensation and other liabilities as a result of an increase in accrual for product warranty liability and other expenses consistent with the growth of our operations….**"

90.     The above statements were materially false and/or misleading, and failed to disclose material adverse facts about the Company at the time they were made because the Defendants materially misstated certain of View's warranty-related obligations, and the cost of revenue associated

with the recognition of those liabilities in 2019 and 2020 for the years ended December 31.

Defendants have admitted that, in contrast to View's reported warranty accrual outlined above, View's

restated warranty-related accruals are $53 million and $48 million as of December 31, 2019 and 2020

respectively, and View's restated cost of revenue was $203.732 million as of December 31, 2019.

Additionally, View's restated net loss for the year ended December 31, 2019 was $312.109 million.

Additionally, statements to the effect that View "estimated the number of IGUs expected to fail in the

remaining warranty period and applied an estimated cost to calculate the cost to replace the IGUs"

failed to disclose to investors that View inappropriately excluded from such "estimated cost" certain

costs, including labor and freight costs, it intended to incur when replacing the IGUs. Furthermore,

Defendants failed to disclose to investors that (1) View's warranty-related obligations, and the cost of

revenue associated with the recognition of those liabilities, were materially false and misleading

because they excluded expenses View incurred and expected to incur due to significant quality issues;

(2) View falsely recorded the liabilities for warranty-related obligations and cost of revenue; (3) View

inappropriately excluded from these liabilities certain costs it incurred and intended to incur when

replacing the Company's IGUs, including installation labor and freight costs; (4) as a result, the

previously reported liabilities associated with warranty-related obligations and the cost of revenue

associated with the recognition of those liabilities were false and materially misstated; and (5) that as a

result of the foregoing, Defendants' positive statements about the Company's business, operations,

and prospects were false and materially misleading.

91.     The March 12, 2021 8-K described View's warranty policy and accounting as follows

(emphasis added):

**Product Warranties**

The Company provides a standard assurance type warranty that its IGUs will be free from
defects in materials and workmanship for 10 years from the date of delivery to customers.
IGUs with sloped or laminated glass have a warranty of 5 years. Control systems
associated with the sale of IGUs have a 5-year warranty. In resolving warranty claims,
the Company has the option of either repairing or replacing the covered product. ***Based
on historical experience, the Company accrues for estimated returns of defective
products at the time revenue is recognized. The Company monitors warranty
obligations and may make revisions to its warranty reserve if actual costs of product
repair and replacement are significantly higher or lower than estimated. Accruals for***

*anticipated future warranty costs are recorded to cost of revenue in the consolidated statements of comprehensive loss and included in other current liabilities and other liabilities on the consolidated balance sheet. Warranty accruals are based on estimates that are updated on an ongoing basis taking into consideration inputs such as changes in the volume of claims compared with the Company's historical experience, and the changes in the cost of servicing warranty claims. The Company accounts for the effect of such changes in estimates prospectively.*

In 2019, we identified a quality issue with certain material purchased from one of our suppliers utilized in the manufacturing of certain IGUs. The Company stopped using the affected materials upon identification in 2019. As of December 31, 2019, we had a low warranty claim rate related to this matter. We have replaced and expect to continue to replace affected IGUs for the remainder of the period covered by the warranty. We analyzed the risk of failure of the affected IGUs by analyzing failure rate as a function of time required for the IGU to fail since it was installed, and the geographical region where the IGU was ultimately installed. Based on this analysis, *the Company estimated the number of IGUs expected to fail in the remaining warranty period and applied an estimated cost to calculate the cost to replace the IGUs. The estimated cost includes the Company's expectations regarding future reductions in production costs, which comprise of materials, labor, and factory overhead. Based on its analysis, the Company recognized $24.5 million of expense for the estimated future cost to replace defective IGUs, which was classified in cost of revenue in its consolidated statement of comprehensive loss for the year ended December 31, 2019. The Company recognized a corresponding warranty liability of $1.6 million in accrued expenses and other current liabilities and $22.9 million in other liabilities on its consolidated balance sheet as of December 31, 2019. As of December 31, 2020, the warranty liability related to this matter included in accrued expenses and other current liabilities and other liabilities was $3.8 million and $18.3 million, respectively, on the consolidated balance sheet. It is reasonably possible that the amount of costs to be incurred to replace the defective IGUs could be materially different from the estimate. Considering the limited failure rate data available to-date and the uncertainty inherent in the failure analysis, including the projected costs to replace defective IGUs in future years, the actual timing of the failures, and the number of defective IGUs, the Company is unable to estimate the amount of any potential additional losses.*

*The Company recorded a net credit of $1.0 million for the reduction in product warranties liability and an expense of $24.1 million for product warranties to cost of revenue in the consolidated statements of comprehensive loss for the years ended December 31, 2020 and 2019, respectively.*

92.     The March 12, 2021 8-K reported that View recorded Warranty accruals of $18.694 million and $23.430 million for the years ended December 31, 2020 and 2019, respectively.

93.     The above statements were materially false and/or misleading, and failed to disclose material adverse facts about the Company at the time they were made because the Defendants materially misstated certain of View's warranty-related obligations, and the cost of revenue associated

with the recognition of those liabilities in 2019 and 2020 for the years ended December 31.

Defendants have admitted that, in contrast to View's reported warranty accrual outlined above, View's

restated warranty-related accruals are $53 million and $48 million as of December 31, 2019 and 2020

respectively, and View's restated cost of revenue was $203.732 million as of December 31, 2019.

Furthermore, statements to the effect that View "estimated the number of IGUs expected to fail in the

remaining warranty period and applied an estimated cost to calculate the cost to replace the IGUs"

failed to disclose to investors that View inappropriately excluded from such "estimated cost" certain

costs, including labor and freight costs, it intended to incur when replacing the IGUs. Furthermore,

Defendants failed to disclose to investors that (1) View's warranty-related obligations, and the cost of

revenue associated with the recognition of those liabilities, were materially false and misleading

because they excluded expenses View incurred and expected to incur due to significant quality issues;

(2) View falsely recorded the liabilities for warranty-related obligations and cost of revenue; (3) View

inappropriately excluded from these liabilities certain costs it incurred and intended to incur when

replacing the Company's IGUs, including installation labor and freight costs; (4) as a result, the

previously reported liabilities associated with warranty-related obligations and the cost of revenue

associated with the recognition of those liabilities were false and materially misstated; and (5) that as a

result of the foregoing, Defendants' positive statements about the Company's business, operations,

and prospects were false and materially misleading.

94.    As noted, the March 12, 2021 Form 8-K, at Exhibit 99.1, included PwC's March 12,

2021 audit opinion, which stated in pertinent part:

Report of Independent Registered Public Accounting Firm
To the Board of Directors and Stockholders of View, Inc.
Opinion on the Financial Statements

    We have audited the accompanying consolidated balance sheets of View
Operating Corporation (formerly known as View, Inc.) and its subsidiary (the
"Company") as of December 31, 2020 and 2019, and the related consolidated statements
of comprehensive loss, of redeemable convertible preferred stock and stockholders'
deficit and of cash flows for the years then ended, including the related notes (collectively
referred to as the "consolidated financial statements"). In our opinion, the consolidated
financial statements present fairly, in all material respects, the financial position of the
Company as of December 31, 2020 and 2019, and the results of its operations and its

cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

Basis for Opinion

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits of these consolidated financial statements in accordance with the standards of the PCAOB and in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ PricewaterhouseCoopers LLP
San Jose, California March 12, 2021

95.   On April 7, 2021, View filed a View filed a Shelf Registration Statement on Form S-1 (the "April 7, 2021 Shelf Registration Statement") relating to the issuance of up to 17,033,303 shares of common stock, consisting of (i) up to 366,666 shares of common stock issuable upon the exercise of private placement warrants originally issued in a private placement to CF Finance Holdings II, LLC, in connection with the initial public offering of CF II and (ii) up to 16,666,637 shares of common stock that are issuable upon the exercise of public warrants.

96.   The April 7, 2021 Shelf Registration Statement reported that the Company's cost of revenue decreased year-over-year in the year ended December 31, 2020.

97.   The above statements above were materially false and/or misleading, and failed to disclose material adverse facts about the Company at the time they were made.

98.    The April 7, 2021 Shelf Registration Statement were materially false and/or misleading for the same reasons as set forth above.

99.    The April 7, 2021 Shelf Registration Statement also included PwC's March 12, 2021 Report, described above.

100.   On May 12, 2021, in a press release filed on Form 8-K with the SEC, View announced its first quarter 2021 financial results, stating in relevant part:

**First Quarter 2021 Highlights:**

- *GAAP cost of revenue of $29.9 million, a 16% improvement from Q1 2020 and a 5% improvement from Q4 2020 due to production efficiencies.*

- *GAAP loss from operations of ($55.1) million, a 22% improvement compared to Q1 2020 and 4% improvement from Q4 2020.*

101.   The above statements were materially false and/or misleading, and failed to disclose material adverse facts about the Company at the time they were made because, in violation of GAAP, Defendants materially misstated certain of View's warranty-related obligations, the cost of revenue associated with the recognition of those liabilities, and loss from operations for the three months ended March 31, 2021. Defendants have admitted that, in contrast to View's reported cost of revenues and warranty accrual outlined above, View's restated warranty-related accruals are $53 million and $48 million as of December 31, 2019 and 2020 respectively, $47 million as of March 31, 2021, and View's restated GAAP cost of revenue for the three months ended March 31, 2021 was $36.179 million. Additionally, View's restated GAAP loss from operations for the three months ended March 31, 2021 was ($64.680) million. Furthermore, Defendants failed to disclose to investors that (1) View's warranty-related obligations, and the cost of revenue associated with the recognition of those liabilities, were materially false and misleading because they excluded expenses View incurred and expected to incur due to significant quality issues; (2) View falsely recorded the liabilities for warranty-related obligations and cost of revenue; (3) View inappropriately excluded from these liabilities certain costs it incurred and intended to incur when replacing the Company's IGUs , including installation labor and freight costs; (4) as a result, the previously reported liabilities associated with warrantyrelated obligations and the cost of revenue associated with the recognition of

those liabilities were false and materially misstated; and (5) that as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were false and materially misleading.

102.   On May 17, 2021, View filed its quarterly report on Form 10-Q for the period ended March 31, 2021 (the "1Q21 10-Q"), signed by Defendants Mulpuri and Prakash. The 1Q21 10-Q reported that the Company's "***Cost of revenue decreased by $5.7 million or 16.0% in the three months ended March 31, 2021 [from $35.57 million] compared to the same period in the prior year, despite the increase in revenue….***" (emphasis added).

103.   Regarding View's cash flows from operating activities for the three months ended March 31, 2021, the 1Q21 10-Q reported a ***net loss of $64.5 million***.

104.   The above statements were materially false and/or misleading, and failed to disclose material adverse facts about the Company at the time they were made because, in violation of GAAP, Defendants materially misstated certain of View's warranty-related obligations, the cost of revenue associated with the recognition of those liabilities, and loss from operations for the three months ended March 31, 2021. Defendants have admitted that, in contrast to View's reported cost of revenues and warranty accrual outlined above, View's restated warranty-related accrual is $48 million as of December 31, 2020, $47 million as of March 31, 2021, and View's restated GAAP cost of revenue for the three months ended March 31, 2021 was $36.179 million. Additionally, View's restated net loss for the three months ended March 31, 2021 was ($74.035) million. Furthermore, Defendants failed to disclose to investors that (1) View's warranty-related obligations, and the cost of revenue associated with the recognition of those liabilities, were materially false and misleading because they excluded expenses View incurred and expected to incur due to significant quality issues; (2) View falsely recorded the liabilities for warranty-related obligations and cost of revenue; (3) View inappropriately excluded from these liabilities certain costs it incurred and intended to incur when replacing the Company's IGUs , including installation labor and freight costs; (4) as a result, the previously reported liabilities associated with warranty-related obligations and the cost of revenue associated with the recognition of those liabilities were false and materially misstated; and (5) that as a result of the

foregoing, Defendants' positive statements about the Company's business, operations, and prospects were false and materially misleading.

105.  Regarding product warranties, the 1Q21 10-Q stated, in relevant part (emphasis added):

**Product Warranties**

The Company provides a standard assurance type warranty that its IGUs will be free from defects in materials and workmanship for generally 10 years from the date of delivery to customers. IGUs with sloped or laminated glass generally have a warranty of 5 years. Control systems associated with the sale of IGUs typically have a 5- year warranty. In resolving warranty claims, the Company generally has the option of either repairing or replacing the covered product. ***Based on historical experience, the Company accrues for estimated returns of defective products at the time revenue is recognized. The Company monitors warranty obligations and may make revisions to its warranty reserve if actual costs of product repair and replacement are significantly higher or lower than estimated. Accruals for anticipated future warranty costs are recorded to cost of revenue in the condensed consolidated statements of comprehensive loss and included in other current liabilities and other liabilities on the condensed consolidated balance sheet. Warranty accruals are based on estimates that are updated on an ongoing basis taking into consideration inputs such as changes in the volume of claims compared with the Company's historical experience, and the changes in the cost of servicing warranty claims. The estimated cost includes the Company's expectations regarding future reductions in production costs which comprise of materials, labor, and factory overhead. The Company accounts for the effect of such changes in estimates prospectively.***

In 2019, the Company identified a quality issue with certain material purchased from one of its suppliers utilized in the manufacturing of certain IGUs. The Company stopped using the affected materials upon identification in 2019. The Company has had a low warranty claim rate to-date related to this matter. The Company has analyzed and expects to continue to replace the affected IGUs for the remainder of the period covered by the warranty. The Company analyzed the risk of failure of the affected IGUs by analyzing historical failure rate as a function of time since the IGU installation. Based on this analysis, ***the Company estimated the number of IGUs expected to fail in the remaining warranty period and applied an estimated cost to calculate the cost to replace the IGUs. The estimated cost includes the Company's expectations regarding future reductions in production costs which comprise of materials, labor, and factory overhead.***

***As of March 31, 2021 and December 31, 2020, the warranty liability included in accrued expenses and other current liabilities was $3.8 and $4.0 million and other liabilities was $18.1 million and $18.7 million, respectively, on the condensed consolidated balance sheets. During the three months ended March 31, 2021, the Company recorded a net credit of $0.3 million for the reduction in product warranties and consumption of $0.5 million. During the three months ended March 31, 2020, the Company recognized a warranty expense of $0.5 million and consumption of $0.7 million.***

106.   The above statements were materially false and/or misleading, and failed to disclose material adverse facts about the Company at the time they were made because, in violation of GAAP, Defendants materially misstated certain of View's warranty-related obligations, and the cost of revenue associated with the recognition of those liabilities for the three months ends March 31, 2021 and 2020. Defendants have admitted that, in contrast to View's reported warranty accrual outlined above, View's restated warranty-related accruals are $48 million and $42 million as of December 31, 2020 and 2021, respectively, and $47 million as of the three months ended March 31, 2021. Furthermore, statements to the effect that View "estimated the number of IGUs expected to fail in the remaining warranty period and applied an estimated cost to calculate the cost to replace the IGUs" failed to disclose to investors that View inappropriately excluded from such "estimated cost" certain costs, including labor and freight costs, it intended to incur when replacing the IGUs. Furthermore, Defendants failed to disclose to investors that (1) View's warranty-related obligations, and the cost of revenue associated with the recognition of those liabilities, were materially false and misleading because they excluded expenses View incurred and expected to incur due to significant quality issues; (2) View falsely recorded the liabilities for warranty-related obligations and cost of revenue; (3) View inappropriately excluded from these liabilities certain costs it incurred and intended to incur when replacing the Company's IGUs, including installation labor and freight costs; (4) as a result, the previously reported liabilities associated with warranty-related obligations and the cost of revenue associated with the recognition of those liabilities were false and materially misstated; and (5) that as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were false and materially misleading.

107.   Additionally, Defendants Mulpuri and Prakash appended certifications pursuant to Sections 302 and 906 of Sarbanes-Oxley Act of 2002, 15 U.S.C. Section 7241 ("SOX") to the 1Q21 10-Q, which were signed by Defendants Mulpuri and Prakash. Each signed a certification that stated, in part, as follows:

1.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

2. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

3. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. [Paragraph intentionally omitted in accordance with SEC Release Nos.34-47986 and 34-54942];

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

4. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

108. Defendants Mulpuri and Prakash also each signed a certification stating, in part, as follows:

1.  the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
2.  the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

109.   Defendants Mulpuri and Prakash's representations were materially false and misleading and failed to disclose material facts at the time they were made because the Defendants Mulpuri and Prakash have effectively admitted that at the time the 1Q21 10-Q was filed, they: 1) had not designed disclosure controls and procedures to ensure that material information relating to View was made known to them; 2) they had not designed internal control over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external disclosure to the SEC and investors in accordance with GAAP; 3) View's disclosure controls and procedures were not effective; 4) they failed to disclose the change in View's internal control over financial reporting that occurred by at least the quarter ended March 31, 2021 that materially, negatively affected View's internal control over financial reporting; and 5) the Company's financial statements for the quarter ended March 31, 2021 were not prepared in accordance with GAAP.

### The Truth Emerges

110.   On August 16, 2021, after the market closed, in a press release filed on Form 8-K with the SEC, View announced that the Audit Committee of View's Board of Directors "began an independent investigation concerning the adequacy of the company's previously disclosed warranty accrual." In an NT 10-Q filed on Form 12b-25 with the SEC filed on August 16, 2021, View stated (emphasis added):

> View, Inc. (the "Company") is unable, without unreasonable effort or expense, to file its Quarterly Report on Form 10-Q for the three and six months ended June 30, 2021 ("Second Quarter 10-Q") within the prescribed time period because it requires additional time to complete the investigation described below. The Company is currently unable to predict when it will be able to file its Second Quarter 10-Q, and does not currently expect to file by the extended filing date pursuant to Rule 12b-25.
>
> **The Audit Committee of the Company's Board of Directors ("Audit Committee") recently began an independent investigation concerning the adequacy of the Company's previously disclosed warranty accrual.** The investigation is ongoing, and the Audit Committee continues to work diligently with independent counsel and advisors to complete the investigation as soon as possible. The Company cannot predict the

duration of the investigation, eventual scope, its outcome, or its impact on the Company's financial results or the Company's assessment of its internal control over financial reporting for prior periods. **As a result, the Company has not finalized its financial statements or its assessment of the effectiveness of its disclosure controls and procedures and internal control over financial reporting for the three and six months ended June 30, 2021.** The Company expects that it will finalize its financial statements and file the related Second Quarter 10-Q as soon as practicable after the conclusion of the investigation.

111.   On this news, the Company's share price fell $1.26, or over 24%, to close at $3.92 per share on August 17, 2021, on unusually heavy trading volume. 119. On February 24, 2022, in a Current Report filed on Form 8-K with the SEC ("Feb. 24, 2022 8-K"), View announced that Harold Hughes resigned as Executive Chair, Principal Executive Officer and director of View on February 22, 2022, effective immediately. The Feb. 24, 2022 8-K also announced that Tom Leppert on that same date also submitted his resignation as a director of the Company, effective immediately. Additionally, View announced that "[i]t is the Company's understanding that Mr. Hughes and Mr. Leppert believe that the Audit Committee's remedial recommendations were not fully implemented by the Board; they believe that the Board's determination of the responsibilities of Mr. Hughes as Executive Chair was inconsistent with what the Board had previously decided."

112.   On March 7, 2022, in a press release filed on Form 8-K with the SEC, View announced "its cash balance of $281 million as of December 31, 2021 with no substantial debt on the balance sheet. View expects to improve cash burn through 2022 on higher volumes and revenues combined with associated improvements in operational efficiencies."

113.   The above statement was materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose that as a result of the adverse facts set forth above, and their impact on the Company's cash burn, Defendants' positive statements about the Company's cash balance and expectation of improved cash burn through 2022 were materially misleading and/or lacked a reasonable basis.

114.   On May 10, 2022, after the market closed, in an NT 10-Q filed on Form 12b-25 with the SEC, View stated (emphasis added):

View, Inc. (the "Company") is unable, without unreasonable effort or expense, to file its Quarterly Report on Form 10-Q for the period ended March 31, 2022 (the "10-Q"), within the prescribed time period for the reasons described below…. While the Audit Committee investigation is now complete, the Company has not been able to finalize its financial statements or corresponding assessment of the effectiveness of its disclosure controls and procedures and internal control over financial reporting. **The Company is also unable to make a reasonable estimate of changes in results of operations in its financial statements at this time; however, management anticipates that they will be disclosing substantial doubt about the Company's ability to continue as a going concern, as the Company does not currently have adequate financial resources to fund its forecasted operating costs and meet its obligations for at least twelve months from the expected issuance date of the 2021 Annual Report on Form 10-K.** While management will look to raise capital, there can be no assurance that the necessary financing will be available or will be available on terms acceptable to the Company. Given the findings of its Audit Committee, the Company also expects to report additional material weaknesses, and is working to determine any additional adjustments to the Company's financial statements that may be required. Although the Company expects that it will finalize its financial statements and file the related 10-Q as soon as practicable, it does not currently expect to file the 10-Q by the extended filing date pursuant to Rule 12b-25.

115.  Later that same day, at approximately 11:13 p.m. Pacific Time, View issued a press release stating, in pertinent part, that:

. . . its cash position [is] $201 million as of the end of Q1 2022 with no substantial debt on its balance sheet. When the Company issues its 2021 financial statements, it anticipates that its reported cash outflow from operations for the twelve months ended December 31, 2021, ranged from $260 million to $270 million.

The Company anticipates that it will be disclosing substantial doubt about the Company's ability to continue as a going concern, as the Company does not currently have adequate financial resources to fund its forecasted operating costs and meet its obligations for at least twelve months from the expected issuance date of its 2021 financial statements. While the Company will look to raise capital, there can be no assurance that the necessary financing will be available or will be available on terms acceptable to the Company.

As previously reported, the investigation of the Company's Audit Committee into its previously reported warranty accrual is now complete. View continues to make substantial progress with its financial restatement and related filings.
To date, outside of the previously reported misstatements in warranty-related accruals, no material errors have been identified in the restatement process, which remains subject to the completion of the Company's financial close process and the completion of the financial statement audit.

As previously reported, Nasdaq has granted View a stay of delisting through the end of May 2022 and completion of its delinquent filings will allow View to regain compliance with applicable Nasdaq listing requirements. The Company will announce an earnings date and dialin details closer to the date of expected filing.

116.   On this news, the Company's share price fell $.844, or over 62%, to close at $.516 per share on May 11, 2022, on unusually heavy trading volume.

## DAMAGES TO THE COMPANY

117.   View has been, and will continue to be, severely damaged and injured by the Defendants' misconduct.  As a direct and proximate result of the Defendants' conduct, View has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

a.   costs incurred in compensation and benefits paid to Defendants that breached their fiduciary duties and violated federal securities laws;

b.   substantial loss of market capital;

c.   costs already incurred and to be incurred defending the Related Securities Action and;

d.   any fines or other liability resulting from the Company's violations of federal law.

118.   In addition, View's business, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired.  The credibility and motives of management are now in serious doubt.

119.   The wrongdoing complained of herein has irreparably damaged View's corporate image and goodwill.  For at least the foreseeable future, View will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that View's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

120.   Plaintiff brings this action derivatively in the right and for the benefit of View to redress injuries suffered, and to be suffered, by the Company as a direct result of violations of federal securities laws by the Defendants. View is named as a Nominal Defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

121.   The Board of View, at the time this action was commenced, consisted of Defendants Mulpuri, Cosgrove, Picard, Gormly, as well as Related Party Non-Defendants Larson-Green and Rechler, a total of six (6) individuals.

122.   Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the View Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

123.   Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material omissions described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

124.   Upon information and belief, in their capacity as officers and/or members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

## Demand is Futile as to Defendant Mulpuri Because of His Principal Professional Occupation as the Company's CEO

125.   Defendant Mulpuri has been the Company's CEO since December 2008. Defendant Mulpuri is also a member of the Board. In his role as CEO of the Company for the fiscal years of 2021, 2020, and 2019, Defendant Mulpuri received $134,836,503, $325,837, and $508,400 in total compensation, respectively. The Company does not claim that Defendant Mulpuri is an independent director and because his primary source of income and primary employment is his employment as CEO of View and his professional reputation is inextricably bound to his role at View. Defendant Mulpuri is incapable of acting independently and demand is futile upon him.

## Demand is Futile as to the Members of the Audit Committee

126.   Demand is futile as to Defendants Gormly and Picard (the "Audit Committee Defendants") as members of the Audit Committee for their knowing failure to fufill their responsibilities.

127.   The Board of Directors adopted an Audit Committee Charter, setting forth the responsibilities of the Audit Committee. The Audit Committee Charter notes that the purpose of the Audit Committee shall be to "assist the Board in overseeing and monitoring: (i) the Company's accounting and financial reporting processes; (ii) the quality and integrity of the Company's financial statements and the auditing of those financial statements; (iii) compliance with legal and regulatory requirements; (iv) the Company's independent registered public accounting firm's qualifications and independence; (v) the design and implementation of the Company's internal audit function…."

128.   Specifically, the Audit Committee Charter notes that the Audit Committee is responsible to "review periodically with the Chief Executive Officer, Chief Financial Officer and the Independent Auditor: (i) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting."

129.   Upon information and belief, in their capacity as members of the Audit Committee, the Audit Committee Defendants were privy to specific information related to the Company's business, operations, and prospects, which would reasonably put them on notice that the statements set forth above in the Company's public filings were materially false and misleading when made.

130.   The Company's public statements and filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information concerning Abbott's failure to establish process controls "designed to ensure that infant formula does not become adulterated due to the presence of microorganisms in the formula or in the processing environment." In their capacity as members of the Audit Committee, the Audit Committee Defendants were charged with ensuring that these reports did not contain such materially misleading information.  By allowing documents to be filled with misleading information, the Audit

Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested.  Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

**Demand is Futile as to the Director Defendants**

131.   Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Company's Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their knowing toleration of the above described false and misleading statements and omissions of material adverse facts, which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

132.   Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

133.   Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period.  By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

134.   Accordingly, the Director Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartiality to consider a demand to sue themselves in the present action.

**COUNT I**

**Against Defendants Mulpri and Prakash for**
**Contribution Under Section 10(b) of the Exchange Act,**
**Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act**

135.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

136.   As a result of the conduct and events alleged above, View has been named as a defendant in the Related Securities Action brought on behalf of View shareholders in which it is a joint tortfeasor in claims brought under Section 10(b) of the Securities and Exchange Act and Rule 10(b)-5 promulgated thereunder.

137.   Federal law provides View with a cause of action against other alleged joint tortfeasors under Rule 10b-5.  In particular, under the Supreme Court's decision in *Musick, Peeler & Garrett v. Employers Insurance of Wausau*, 508 U. S. 286, View has a federal law right of contribution against joint tortfeasors under Rule 10b-5.  Section 21D(f) of the Securities and Exchange Act further sets forth specific provisions entitling View to contribution against all joint tortfeasors under Rule 10b-5, regardless of whether they have been named as defendants in the currently pending Related Securities Action, and sets forth specific rules regarding the determination of claims for such contribution.

138.   Accordingly, Plaintiff, on behalf of View, hereby claims contribution against Defendants Mulpri and Prakash, each of whom has been named in the currently pending Related Securities Action as a joint tortfeasor with View under Rule 10b-5, or if joined in such actions, would be liable for the same damages as View.

139.   View claims no right to indemnification under the federal securities laws from them in this count, but rather only claims contribution.

**Allegations Regarding Defendants Mulpri and Prakash**

140.   Throughout the Relevant Period, Defendants Mulpri and Prakash caused the Company to issue false and misleading statements and/or omit material information in public statements and/or Company filings concerning the Company's business and financial prospects.  These statements were materially misleading to persons who purchased View securities during the Relevant Period.

141.   The plaintiffs in the Related Securities Action allege that they relied, directly or indirectly, upon these false statements and misleadingly omissive disclosures in purchasing View securities, and, as a result, suffered damages because value of their investments was distorted by the false and materially omissive statements, and they purchased such securities at such distorted prices.

142.   The damages suffered by said investors were caused by reason of the fact that (i) they were induced to purchase said securities by the false and misleading statements alleged herein, and (ii)

the reveal of the true nature of the Company's business and prospects resulted in the decrease in price of its securities, causing the value of shareholders investments to drop.

143.   The plaintiffs in the Related Securities Action were unaware of the false and misleading nature of said statements and omissive disclosures.

144.   When Defendants Mulpri and Prakash signed off on or made the false statements and omissive disclosures detailed herein, they had actual knowledge that they were false and misleading. As alleged in detail herein, due to their positions as employees and/or directors of View, Defendants Mulpri and Prakash were privy to information regarding the Company's business and financial prospects and would have been aware that the statements made were in fact false and misleading when made.

145.   Accordingly, Defendants Mulpri and Prakash are liable for damages under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and, if View were to be held liable in the Related Securities Action, Defendants Mulpri and Prakash would be liable to it for contribution. Plaintiffs hereby derivatively claim such right of contribution on behalf of View.

**Allegations Regarding Defendants Mulpri and Prakash as Control Persons**

146.   In acting as alleged above, Defendants Mulpri and Prakash were acting as authorized agents of View in their roles as directors and/or employees.  Because of their positions of control and authority as senior officers and/or directors, Defendants Mulpri and Prakash were able to, and did, control the contents of the various reports, press releases and public filings disseminated by the Company throughout the Relevant Period, as alleged herein.

147.   Defendants Mulpri and Prakash were "controlling persons" of View within the meaning of Section 20(a) of the Exchange Act, and, accordingly, Defendants Mulpri and Prakash could be held liable to the plaintiffs in the Related Securities Action.  Were the Company to be held liable in said Related Securities Action, Defendants Mulpri and Prakash would be liable to it for contribution.

148.   Plaintiff hereby derivatively claims such right of contribution on behalf of View.

1

2

**COUNT II**

**Against the Individual Defendants for Breaches of Fiduciary Duty**

3      149.   Plaintiff incorporates by reference and realleges each and every allegation contained

4    above, as though fully set forth herein.

5      150.   The Individual Defendants owed and owe View fiduciary obligations. By reason of their

6    fiduciary relationships, the Individual Defendants owed and owe View the highest obligation of good

7    faith, loyalty, and due care.

8      151.   The Individual Defendants have violated and breached their fiduciary duties of good

9    faith, loyalty, and due care by causing or allowing the Company to disseminate to View shareholders

10   materially misleading and inaccurate information through the Company's SEC filings throughout the

11   Relevant Period.  These actions could not have been a good faith exercise of prudent business

12   judgment.

13      152.   During the course of the discharge of their duties, the Individual Defendants knew or

14   recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the

15   Individual Defendants caused View to engage in the conduct complained of herein which they knew

16   had an unreasonable risk of damage to the Company, thus breaching their duties owed to View and its

17   shareholders.  As a result, the Individual Defendants grossly mismanaged the Company.

18      153.   As a direct and proximate result of the Individual Defendants' failure to perform their

19   fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct

20   alleged herein, the Individual Defendants are liable to the Company.

21      154.   Plaintiff, on behalf of View, has no adequate remedy at law.

22

23

24

25

26

27

28

**COUNT III**

**Against the Individual Defendants for Unjust Enrichment**

155.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

156.   By his wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of View.

157.   The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to View.

158.   Plaintiff, as a shareholder and representative of View, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and breaches of fiduciary duty.

159.   Plaintiff, on behalf of View, has no adequate remedy at law.

**COUNT IV**

**Against the Individual Defendants for Waste of Corporate Assets**

160.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

161.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

162.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things: (a) paying excessive compensation and bonuses to certain executive officers; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Related Securities Action.

163.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

164.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A. Declaring that Plaintiff may maintain this action on behalf of View and that Plaintiff is an adequate representative of the Company;

B. Determining and awarding to View the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

C. Directing View and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect View and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

1) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

2) a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

D. Determining and awarding to View exemplary damages in an amount necessary to punish Defendants and to make an example of Defendants to the community according to proof at trial;

E. Awarding View restitution from Defendants, and each of them;

F. Awarding View Contribution from Defendants Mulpri and Prakash, and each of them;

G. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H. Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.


Dated:      May 9, 2023                    **REICH RADCLIFFE & HOOVER LLP**


                                           By: /s/ Adam T. Hoover
                                           Adam T. Hoover

                                           **LIFSHITZ LAW PLLC**

                                           Joshua M. Lifshitz

                                           Attorneys for Plaintiff

COMPLAINT

**<u>VERIFICATION</u>**

I, Alexandre Roberts hereby declare as follows:


  I am shareholder of VIEW and have continuously so owned the Company's common stock during the relevant period. I declare that I am the plaintiff named in the foregoing Shareholder Derivative Complaint ("Complaint"), and know the content thereof; that the pleading is true to my knowledge, except as to those matters stated on information and belief, and that as to such matters I believe to be true.  I declare under penalty of perjury that the foregoing is true and correct.


Executed on 03/31/2023



                    Signature